# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

MS, through his next friend and parent,
FLORINDA HARRIS,

      Plaintiff,

      v.                                                              No. CIV 13-628 RB-GBW

EASTERN NEW MEXICO MENTAL
RETARDATION SERVICES, et al.,

      Defendants.

## <u>OMNIBUS MEMORANDUM OPINION AND ORDER</u>

Plaintiff MS is a developmentally disabled adult who formerly resided at and worked for Defendant Eastern New Mexico Mental Retardation Services, which operates as Eastern New Mexico Rehabilitative Services for the Handicapped, Inc., locally known as "ENMRSH." Plaintiff alleges that Defendants, including ENMRSH, its employees, and local healthcare providers, violated his constitutional and state law rights by abusing him, involuntarily committing him, and using his governmental benefits for their own purposes. Defendants filed three motions to dismiss (Docs. 84, 90, 95) and two motions for summary judgment (Docs. 103, 130). Having reviewed the parties' arguments and submissions, the Court grants in part and denies in part Defendants' Motion to Dismiss Defendants Houfek and Spencer (Doc. 84); grants Defendants' Motion to Dismiss Plaintiff's Workplace Injury Claim (Doc. 90); grants Defendant Robert B. Spencer Foundation's Motion to Dismiss (Doc. 95); denies Defendants' Motion for Summary Judgment Regarding Plaintiff's Americans with Disabilities Act and Rehabilitation Act Claims (Doc. 103); and grants Defendants' Motion for Summary Judgment Regarding Plaintiff's Constitutional Claims (Doc. 130).

## I.      BACKGROUND

Plaintiff MS, a developmentally disabled adult, first became an ENMRSH client in 2006 when he was 26 years old.  (Third Am. Compl. ("TAC") ¶¶ 1, 6.)   His parents sought ENMRSH's services and enrolled him in ENMRSH's programs.  (Doc. 130 ¶ 9.)   At first, Plaintiff attended ENMRSH for habilitation services during the day.  (TAC ¶ 6.)   In 2008, Plaintiff began living at ENMRSH full time.  (*Id.*)   He also participated in ENMRSH's vocational training program and eventually began performing work through ENMRSH.  (*Id.* ¶¶ 7, 29-32.)   Due to various impairments, Plaintiff was, and is, "entirely dependent on others to protect him from harm."  (*Id.* ¶ 2.)

During his time at ENMRSH, Plaintiff claims he was physically abused and neglected on numerous occasions.  On June 22, 2006, Plaintiff claims he suffered serious eye damage and vision loss while working for ENMRSH.  (*Id.* ¶¶ 30, 47.)   Allegedly, Plaintiff was told to hold an uncovered bucket of caustic chemicals during a bumpy car ride.  (*Id.* ¶¶ 39, 41.)   Defendant Tisha Lovelady, his ENMRSH supervisor, knew he had been splashed with the chemicals.  (*Id.* ¶¶ 39, 42-43.)   Despite this knowledge, neither Defendant Lovelady nor any other ENMRSH employee did anything when Plaintiff developed an obvious eye irritation.  (*Id.* ¶ 44.)   Three years later, on September 15, 2009, Plaintiff alleges that Defendant Chris Sena, an ENMRSH employee, violently punched and kicked Plaintiff.  (*Id.* ¶ 55.)   The alleged abuse was so severe that a neighbor called the police to investigate.  (*Id.* ¶¶ 55-57.)   Furthermore, Plaintiff claims that he was regularly assaulted, injured, taunted, and teased by ENMRSH employees.  (*Id.* ¶¶ 59-60.) He started receiving scars from cigarette burns around January 2010.  (*Id.* ¶ 60.)

Plaintiff next alleges that ENMRSH improperly medicated him and then committed him to inpatient psychiatric care.  Around 2009, a doctor began prescribing Plaintiff psychotropic

medications, even though Plaintiff never exhibited any psychotic symptoms. (*Id.* ¶ 65, 66.) The medications were intended to treat Plaintiff's "behavior problems and depression," but were not tailored to Plaintiff's needs. (*Id.* ¶ 66.) ENMRSH allegedly did not consider less restrictive medical or therapeutic alternatives. (*Id.* ¶ 67.) Due to the medications, Plaintiff now suffers from edema and other side effects. (*Id.* ¶ 68.) Additionally, in 2010, based on so-called behavior issues, ENMRSH committed Plaintiff to the Sunrise Mental Health Center at the Eastern New Mexico Medical Center. (*Id.* ¶¶ 69, 71.) Not only was Plaintiff's family never consulted before Plaintiff's commitment, his family was barred from visiting him. (*Id.* ¶¶ 70, 79.) Defendant Dr. Reza Mirin allegedly ordered Plaintiff's commitment based on "exaggerated" reports from ENMRSH staff and failed to conduct an individualized evaluation. (*Id.* ¶¶ 72, 75.) After five days, Plaintiff was discharged. (*Id.* ¶ 80) Plaintiff argues that he was improperly medicated and committed based on his developmental disability, not based on medical necessity. (*Id.* ¶ 82.)

Plaintiff further alleges that ENMRSH took financial advantage of him. ENMRSH became Plaintiff's representative payee, and so received all of Plaintiff's Social Security income and Medicaid benefits. (*Id.* ¶ 15.) Instead of using these funds for Plaintiff's benefit, Plaintiff alleges that ENMRSH's officers "used these financial resources to benefit themselves and their employees." (*Id.* ¶¶ 84, 100, 103.) According to the Third Amended Complaint, in his role as Chief Executive Officer ("CEO") and President of ENMRSH, Defendant Spencer earned an average $450,000 annually for the years 2005-2010. (*Id.* ¶ 101.) Plaintiff alleges that Defendant Spencer established the Robert B. Spencer Foundation, which has received millions of dollars from ENMRSH since 2007. (*Id.* ¶¶ 13, 102.) Defendant Spencer created the Foundation, Plaintiff alleges, to be a joint venture with ENMRSH and used it to divert funds. (*Id.* ¶¶ 13, 14, 16, 103.) Finally, Plaintiff alleges that ENMRSH, a subsidized participant in the

Developmentally Disabled waiver program, underpaid Plaintiff for the work he performed and otherwise violated New Mexico's regulatory standards. (*Id.* ¶¶ 54, 91, 92.)

In sum, Plaintiff avers that ENMRSH was not the institution it held itself out to be. Plaintiff claims he was inadequately supervised and denied services which he was entitled to receive. (*Id.* ¶¶ 85-86.) ENMRSH represented itself as a quality service-provider, yet Plaintiff claims that ENMRSH failed to abide by basic legal requirements. (*Id.* ¶¶ 176-77, 198.)

Plaintiff filed suit, bringing state and federal claims, against Defendants on July 8, 2013. (Doc. 1.) After amending his Complaint several times, Plaintiff settled on the currently operative Third Amended Complaint. (TAC, Doc. 81.) The parties have not yet begun discovery. Presently, before the Court, are three motions to dismiss and two motions for summary judgment. For organizational reasons, the Court first addresses the two motions for summary judgment.

## II.  MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF'S CONSTITUTIONAL CLAIMS

Plaintiff brings several constitutional claims against ENMRSH and its employees for violations of his First Amendment rights, Fourth Amendment rights, substantive due process rights, and procedural due process rights. (Compl. ¶¶ 127-36, 144-48.) Alleging a failure to train and an unlawful custom, Plaintiff also seeks to hold ENMRSH liable for Section 1983 municipal liability claims. (Compl. ¶¶ 137-44.) ENMRSH and its employees assert that these causes of action must fail because they are not state actors and did not act under color of state law. (Doc. 130.) Because the facts are undisputed, the Court will decide the motion for summary judgment as a matter of law. Summary judgment is appropriate when disputes are purely legal. *See Thomas v. Metro. Life Ins. Co.*, 631 F.3d 1153, 1160 (10th Cir. 2011)

(affirming summary judgment on statutory interpretation as "a matter of law appropriate for resolution on summary judgment").

ENMRSH is a private non-profit corporation and its employees are privately-employed.[1] (Doc. 130 ¶ 2.)  To support its programs, ENMRSH receives some funding from the state of New Mexico.  (*Id.* ¶ 4.)  ENMRSH agreed to comply with New Mexico Department of Health regulations in order to receive funds through the state's Developmental Disabilities waiver program.  (*Id.*)  With these funds, ENMRSH continues to offer private habilitation and supported-living services.  (*Id.* ¶ 2, 4-7.)  Plaintiff's parents enrolled him at ENMRSH in 2004 on a voluntary basis.  (*Id.* ¶ 9.)  After becoming unhappy with Defendant's services, Plaintiff's mother withdrew Plaintiff from ENMRSH's care.  (*Id.* ¶ 12.)  At no point was Plaintiff committed to the custody of the State of New Mexico.  (*Id.* ¶ 8.)  Plaintiff acknowledges these facts, but alleges that ENMRSH and its employees nonetheless acted under color of state law. (TAC ¶ 129; Doc. 136 at 1.)

"[M]ost rights secured by the Constitution are protected only against infringement by governments."  *Flagg Bros. v. Brooks*, 436 U.S. 149, 156 (1978).  In particular, all of the constitutional provisions that Plaintiff invokes—the First, Fourth, and Fourteenth Amendments—require some form of state involvement.  *See, e.g.*, *Cohen v. Cowles Media Co.*, 501 U.S. 663, 668 (1991) (requiring "'state action' within the meaning of the Fourteenth Amendment" to trigger "the protections of the First Amendment"); *United Bhd. of Carpenters & Joiners of Am., v. Scott*, 463 U.S. 825, 833 (1983) (finding that the First Amendment "restrains only official conduct"); *United States v. Jacobsen*, 466 U.S. 109, 113 (1984) ("This Court has

---

[1] Plaintiff has admitted to the following facts for the purposes of this motion for summary judgment.  (Doc. 136 at 2.)

also consistently construed [the Fourth Amendment's] protection as proscribing only governmental action; it is wholly inapplicable 'to a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the Government or with the participation or knowledge of any governmental official.'"); *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 936 (1982) (holding that a claim for the protections of the Fourteenth Amendment requires a showing of state action). "Careful adherence to the 'state action' requirement preserves an area of individual freedom by limiting the reach of federal law and federal judicial power. It also avoids imposing on the State, its agencies or officials, responsibility for conduct for which they cannot fairly be blamed." *Lugar*, 457 U.S. at 936.

Accordingly, the Supreme Court has "insisted that the conduct allegedly causing the deprivation of a federal right be fairly attributable to the State." *Id.* at 937. "[T]he party charged with the deprivation must be a person who may fairly be said to be a state actor." *Id.* Notably, the Tenth Circuit recently clarified that, when considering whether a private entity can be considered a state actor, courts must analyze the claim under four well-defined tests: (1) the nexus test; (2) the public function test; (3) the joint action test; and (4) the symbiotic relationship test. *See Wittner v. Banner Health*, 720 F.3d 770, 775 (10th Cir. 2013) (explaining the four tests for determining when a private entity can be considered a state actor). Plaintiff must show that ENMRSH qualifies as a state actor under one of these four tests. *Id.*

Determining whether a private entity acts as a state actor requires a fact-specific inquiry. *See Gallagher v. Neil Young Freedom Concert*, 49 F.3d 1442, 1447 (10th Cir. 1995) ("The Court has taken a flexible approach to the state action doctrine, applying a variety of tests to the facts of each case."). "Only by sifting and weighing circumstances can the nonobvious involvement of the State in private conduct be attributed its true significance." *Burton v. Wilmington Parking*

*Auth.*, 365 U.S. 715, 722 (1961).  The Court must engage in the facts before it.  Accordingly, the Court analyzes below whether ENMRSH and its employees can be deemed state actors when they treated Plaintiff and allegedly deprived him of constitutional rights.

### A.  The Public Function Test

When a private entity undertakes a public function—defined as a traditional and exclusive function of the state—it is considered to be a state actor.  *Wittner*, 720 F.3d at 776-77.  "This test is difficult to satisfy.  While many functions have been traditionally performed by governments, very few have been exclusively reserved to the State."  *Id.* (quoting *Gallagher*, 49 F.3d at 1456).

To support his argument, Plaintiff relies on a New Mexico Court of Appeals case, *LaBalbo v. Hymes*, 850 P.2d 1017 (N.M. Ct. App. 1993).  Plaintiff claims that *LaBalbo* stands for the proposition that any private entity providing services to mentally disabled persons under a contract with New Mexico "is a state actor when it makes decisions regarding the treatment and discharge of those persons under its care."  (Doc. 136 at 3 (quoting *LaBalbo*, 850 P.2d at 1019).) *LaBalbo*, however, is distinguishable.

*LaBalbo* focused on the treatment of Joanne LaBalbo, a developmentally disabled woman.  *LaBalbo*, 850 P.2d at 1019.  Like Plaintiff, Ms. LaBalbo lived at a privately-owned disability services facility.  *Id.* at 1019, 1022.  In that case, however, the *LaBalbo* court presumed that New Mexico "voluntarily assumed a duty to provide" habilitation services to Ms. LaBalbo, that Ms. LaBalbo was "wholly dependent on the state," and that the state delegated its authority to institutionalize Ms. LaBalbo to the private facility.  *Id.* at 1024 & n.3.  The court determined that the services Ms. LaBalbo was receiving were "provided directly by the state and at state-operated facilities."  *Id.*  Once a person became a client of the state, the court found, New

Mexico did "not distinguish between clients receiving services at private or public facilities and accepts the ultimate responsibility to ensure protection of the statutory and constitutional rights of *all* clients." *Id.* at 1023-24.  The decision to provide Ms. LaBalbo's services through a private contractor, as opposed to a state-run facility, the court reasoned, did not reduce her legal protections. *Id.* at 1025.

Moreover, the *LaBalbo* court was focused on a narrow question: whether the private facility acted under color of state law when it discharged Ms. LaBalbo.  *Id.* at 1027 (considering whether "the private entity's discharge decision will be considered state action for purposes of maintaining a Section 1983 suit").  The court determined that, given the statutory scheme, the facility was a state actor when it made its discharge decision.  *Id.* at 1024.  The facility could not use its own discretion when making discharge decisions, but rather had to follow state requirements.  *Id.*  The court contrasted the discharge statute with other provisions, such as the state's civil commitment statutes, "where the legislature intended that a physician could be the sole decision-maker."  *Id.* at 1026.

Importantly, the *LaBalbo* court does not establish a different test for determining whether a private entity acts under color of state law.  When analyzing whether the private facility acted under color of state law, the *LaBalbo* court cited and considered federal law.  *See id.* at 319-20 (citing federal cases).  In fact, the *LaBalbo* court utilized the federal state actor tests in making its own determination.  *See id.* (applying joint action test, nexus test, and public function test).  Contrary to Plaintiff's argument, this Court does not have to defer to a state court of appeal's interpretation of federal law.  The Court generally gives credence to a state court's interpretations of state statutes; yet, in this case, many of the statutes that the *LaBalbo* court relied upon have since been repealed.  *See* N.M. Stat. Ann. §§ 28-16-1, *et al.* (repealed in 1993).

The current statute seems to manifest the New Mexico legislature's intention that private facilities cannot be transformed into state actors simply because they are regulated by state standards.   *See* N.M. Stat. Ann. § 28-16A-17 ("Except as otherwise provided, each service provider shall be considered to be an independent contractor and not an entity of state government.").

Despite Plaintiff's invocation of *LaBalbo*, the Court is not willing to find that the state of New Mexico imposed on itself an obligation to provide disability services to any and all of its citizens.   The *LaBalbo* court found that Ms. LaBalbo was a client of New Mexico and in state custody.   *See LaBalbo*, 850 P.2d at 1023-24 & n.3.  Here, Plaintiff admits that he was never committed to the custody of New Mexico and that his parents chose to place him in ENMRSH's care.  (Doc. 130 ¶ 8-9; Doc. 136 at 2.)  Plaintiff argues that, through its statutory scheme, "New Mexico nonetheless continues to manage the treatment accorded" to all developmentally disabled citizens in New Mexico.  (Doc. 136 at 4.)  Without a doubt, ENMRSH is heavily regulated by state standards and admits as much.  (Doc. 130 ¶ 4.)  However, "[a]ction by a private party pursuant to [state] statute, without something more, [i]s not sufficient to justify a characterization of that party as a 'state actor.'"  *Lugar*, 457 U.S. at 939.  Even if New Mexico "created a universal right to" disability support and services, "but then 'delegated' its implementation to the private sector, such a 'delegation' would not automatically make private actors state actors."  *See Wittner*, 720 F.3d at 780 (applying similar logic to the plaintiff's theory that Colorado created a universal right to state-provided mental health care).  "Delegation does not create state action without at least one of the additional features described above: compulsion, a public function, joint action, or a symbiotic relationship."  *Id.*  As an example, in *LaBalbo*, the court found a nexus between the state discharge statute and the facility's decision.

*See LaBalbo*, 850 P.2d at 1024 (finding "a sufficient nexus between the private entity's decision and the state has been demonstrated so that the private entity's discharge decision will be considered state action for purposes of maintaining a Section 1983 suit.").  Plaintiff has not made a sufficient showing here.

First, Plaintiff's participation in ENMRSH's habilitation services did not implicate state action.  According to the New Mexico Supreme Court's decision in *State v. Trujillo*, the state does not have authority to commit an individual to habilitation; "only a guardian may commit an individual with mental retardation to habilitation under [New Mexico] statute."  206 P.3d 125, 133 (N.M. 2009) (citing N.M. Stat. Ann. §§ 43–1–3, –13).  Thus, committing Plaintiff to habilitation services was not an exclusive state function.  Indeed, Plaintiff's parents placed him in the ENMRSH group home.  (Doc. 136 at 4.)

Second, Plaintiff's alleged involuntary commitment to the hospital for five days did not implicate an exclusively public function.  The Tenth Circuit does not consider temporary civil commitments to be traditional and exclusive state functions in New Mexico.  *See Wittner*, 720 at 780 ("[W]e and other circuits . . . have declined to import this 'public function' label onto short-term involuntary mental health holds in private *hospitals*.").  As described by *Wittner*, the Tenth Circuit found that private actors' roles in involuntary committing another did not make them state actors, even though they acted pursuant to a New Mexico civil commitment statute.  *Id.* (citing *Pino v. Higgs*, 75 F.3d 1461, 1467 (1996)).

Plaintiff has not convinced this Court that ENMRSH undertook traditional and exclusive public functions.  Therefore, Plaintiff cannot invoke the public function test to prove that ENMRSH was a state actor.

## B.  The Nexus Test

When the state coerces a private entity into making particular decisions, the private entity's actions are considered state actions.  *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 296 (2001) (citing *Blum v. Yaretzky*, 457 U.S. 991, 1004 (1994)).  Plaintiff challenges three transactions as state-coerced decisions: Plaintiff's chemical burn, battery, and commitment to a mental hospital.  (Doc. 136 at 5.)  In making these allegations, Plaintiff does not offer any argument to explain the nexus between ENMRSH employees' decisions leading to the chemical burn or battery.  The Court does not see the nexus.  Instead, the Court will focus on Plaintiff's arguments relating to the involuntary commitment to Sunrise Medical Health Center.  (Doc. 136 at 5-6.)  Allegedly, ENMRSH employees brought Plaintiff to the hospital and Defendant Dr. Reza Mirin admitted Plaintiff for five days.  (TAC ¶¶ 71, 80.)

The Court finds instructive the Tenth Circuit's opinion in *Pino*.  In *Pino*, the plaintiff sued several defendants, including a privately-employed social worker, for violating her constitutional rights when she was detained for a mental health evaluation. 75 F.3d at 1463.  The social worker recommended that the plaintiff be evaluated for commitment; she also called the police to investigate and to transport the plaintiff, but the Tenth Circuit determined that none of these actions made her a state actor.  *See id.* at 1463-66.  The fact that she was a social worker "while lending credibility to her opinion, carries with it no special state-generated authority that would make her conduct attributable to the state."  *Id.* at 1466.  By analogy, the fact that ENMRSH employees transported Plaintiff to the hospital and recommended that he be evaluated does not constitute state action.  A private person's recommendation that someone be committed does not give them state power. *Id.* at 1466.

Similarly, if ENMRSH invoked a New Mexico statute to determine that commitment was necessary, that decision was not coerced by the state.  *Id.* at 1466.  Again, *Pino* is instructive.  In *Pino*, the privately-employed doctor temporarily committed the plaintiff under New Mexico's involuntary commitment statute, N.M. Stat. Ann. § 43-1-10.  *Id.* at 1466.  Although the New Mexico statute uses mandatory language stating that physicians "shall evaluate" clients, the Circuit noted that "the state has no authority and cannot require the admitting doctor to examine" anyone.  *Id.*  The Circuit "concluded that private party actions under state statutes that permit but do not compel, encourage, or pressure a private physician to execute certificates authorizing involuntary mental health examinations do not constitute state actions."  *Id.* (citations omitted); *accord LaBalbo*, 850 P.2d at 1026 (noting that private actors are the sole decision-makers, and act without coercive state authority, when making commitment decisions).

Although New Mexico law permits temporary commitment, it by no means compels temporary commitment under any circumstances.  *Pino*, 75 F.3d at 1466; *LaBalbo*, 850 P.2d at 1026.  When state law does not require a particular outcome, private decision-makers relying on state law are transformed into state actors.  *See Blum*, 457 U.S. at 1010 (finding regulations that "themselves do not dictate the decision . . . in a particular case" do not create a state action nexus).  Thus, ENMRSH employees did not act as state officials if they determined that Plaintiff needed to be committed.  Even if ENMRSH's employees improperly convinced Defendant Doctor Reza Martin to commit Plaintiff to the hospital (Doc. 136 at 6), that does not convert their actions into state actions.  If the ENMRSH employees claimed state power to commit Plaintiff and bullied the doctor into committing Plaintiff, they could be liable for misrepresentation, but that does not transform their actions into state action.

### C.  The Joint Action Test

If a private entity acts "in concert" with state officials to deprive a person of constitutional rights, then they have acted jointly and the action is considered state action. *Wittner*, 720 at 777 (quoting *Gallagher*, 49 F.3d at 1456).  In *Gallagher*, a group of plaintiffs challenged the constitutionality of pat down searches they encountered before attending a concert at a state university.  *Gallagher*, 49 F.3d at 1445-46.  Although the concert was held on state university land, a private company produced the concert.  *Id.* at 1445.  As part of the contract and lease agreement, the state university required the concert producers to provide security and crowd management for the venue.  *Id.*  Based on the contract requirements, the plaintiffs argued that the concert producers and the state were joint actors in the challenged pat down policy.  *Id.* at 1455.  While recognizing that the contract "established general obligations to provide security," the Tenth Circuit found that the contract was "silent as to the kind of security provided."  *Id.*  This silence, the Tenth Circuit reasoned, established that the state acquiesced "in the practices" but was "insufficient to establish state action under the joint action test."  *Id.* "[T]he mere acquiescence of a state official in the actions of a private party is not sufficient."  *Id.* at 1453.  The Circuit also reasoned that the state and the producer did not act in concert, even though they "shared the common goal of producing a profitable music concert."  *Id.* at 1455. The key question, the Circuit clarified, was whether the state and private entity "share[d] a specific goal to violate the plaintiff's constitutional rights by engaging in a particular course of action."  *Id.*

Here, although Plaintiff alleges that ENMRSH employees were regulated by state law, that is insufficient to establish joint action.  Importantly, Plaintiff has not alleged that ENMRSH and state officials conspired, acted according to a prearranged plan, or engaged in a "substantial

13

degree of cooperative action." *See id.* at 1454 (collecting cases).  Nor has Plaintiff alleged "overt and significant state participation." *See id.* (quoting *Hoai v. Vo*, 935 F.2d 308, 313 (D.C. Cir. 1991)).  In short, Plaintiff has not alleged that the state and ENMRSH jointly acted to deprive Plaintiff of his constitutional rights.

### D.  The Symbiotic Relationship Test

A private entity is said to form a "symbiotic relationship" with the State when "the state has 'so far insinuated itself into a position of interdependence' with the private party."  *Id.* at 1447 (quoting *Burton*, 365 U.S. at 725).  To become symbiotic, the State's relationship with the private actor must go "beyond the 'mere private purchase of contract services.'"  *Wittner*, 720 F.3d at 778 (quoting *Brentwood Acad.*, 531 U.S. at 299).  "[A] public-private relationship can transcend that of mere client and contractor if the private and public actors have sufficiently commingled their responsibilities."  *Id.*

Here, Plaintiff has not alleged that ENMRSH and New Mexico have the "kind of heavily interdependent relationship" necessary to form a symbiotic relationship.  *Id.* at 779.  In *Wittner*, the Circuit considered whether Colorado had a symbiotic relationship with a private physician, nurse, and medical center.  *Id.* at 771.  The plaintiff in *Wittner* claimed that the hospital deprived him of due process when it held him involuntarily and medicated him with antipsychotic drugs. *Id.* at 771-72.  Although the hospital workers acted pursuant to state law and worked in "a heavily regulated" environment, the hospital remained a privately-owned facility.  *Id.* at 779. The Circuit ruled that the state law and regulations were "not sufficient to connect the State with the respondent's action so as to make the latter's conduct attributable to the State."  *Id.* (quoting *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 358 (1974)).  The present case is directly analogous to *Wittner*.  Although Plaintiff alleges that ENMRSH is heavily regulated by New Mexico, that

14

does not mean that the two had a symbiotic relationship for the purposes of directing Plaintiff's medical care and habilitation.

### E.  Plaintiff's Remaining Arguments

In a similar vein, Plaintiff seeks to hold ENMRSH liable for Section 1983 municipal liability claims.  (Compl. ¶¶ 137-44.)  Municipalities and local government agencies can be held liable under Section 1983 when their policies or customs deprive persons of constitutional rights. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978) (holding that if "official policy is responsible for a deprivation of rights protected by the Constitution, local governments, like every other § 1983 'person,' by the very terms of the statute, may be sued for constitutional deprivations").  Plaintiff has failed to show that either a state or a local government was responsible for the challenged ENMRSH decisions.  For that reason, these claims also fail.

In sum, Plaintiff's efforts to lean on ENMRSH's acceptance of federal funds and regulations to show that it is a state actor are unavailing.  That is, simply, not enough to ascribe a private entity's actions to the state.  *See Rendell-Baker v. Kohn*, 457 U.S. 830, 832-33 (1982) (holding that a private school was not necessarily a state actor even though it accepted 90-99% of its funding from the state, was heavily regulated by state law, and operated under a contract with the state).  Plaintiff was required to show that ENMRSH was a state actor under one of the four defined tests, *see Wittner*, 720 F.3d at 779-80, but failed to do so.  For this reason, the Court grants ENMRSH's and its employees' motion for summary judgment on the constitutional claims.  All the claims in the Third Amended Complaint's Second Cause of Action are dismissed.

III.   **MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF'S REHABILITATION ACT AND AMERICANS WITH DISABILITIES ACT CLAIMS**

Plaintiff brings claims against ENMRSH under the Americans with Disabilities Act ("ADA") and the Rehabilitation Act.  Both Acts were intended to remedy a long history of discrimination against persons with disabilities.  *See Tennessee v. Lane*, 541 U.S. 509, 516 (2004) ("The ADA was passed by large majorities in both Houses of Congress after decades of deliberation and investigation into the need for comprehensive legislation to address discrimination against persons with disabilities."); *Consol. Rail Corp. v. Darrone*, 465 U.S. 624, 626 (1984) ("The Rehabilitation Act of 1973 establishes a comprehensive federal program aimed at improving the lot of the handicapped.").  ENMRSH moved for summary judgment on both claims.  (Doc. 103.)  In its recital of undisputed facts, ENMRSH avers that it provides services only to people with disabilities and has never provided services to the non-disabled.  (*Id.* ¶ 2-3.) Plaintiff does not dispute these facts.  (Doc. 124.)

This pre-discovery motion for summary judgment does not turn on factual issues. Instead, the parties argue over the correct legal standard to apply.  To merit summary judgment, the movant must show more than a lack of disputed facts; the movant must also show that summary judgment is appropriate "as a matter of law."  Fed. R. Civ. P 56(a).  Merely because the movant's facts are uncontested does not mean that summary judgment is appropriate.  *See Edwards v. Aguillard*, 482 U.S. 578, 595 (1987) ("The existence of 'uncontroverted affidavits' does not bar summary judgment.").

ENMRSH argues that "when an organization's sole purpose is to provide services to the disabled, it simply cannot be found to have discriminated against an individual on the basis of the disability."  (Doc. 103 at 5.)  Taking this a step further, ENMRSH asserts that because it

serves only the disabled, it "cannot violate the Rehabilitation Act" even if it provides "inadequate care/benefits." (Doc. 103 at 5.)  Because it only provides services to persons with disabilities, ENMRSH claims that it is entitled to summary judgment on both the Rehabilitation Act and ADA claims.  In making this argument, ENMRSH relies on a Tenth Circuit case, *Johnson by Johnson*, and a district court case, *Baumeister*.  (Doc. 103.)  Defendant isolated case language to support this proposition, yet the holdings of both cases must be examined in context.

*Johnson by Johnson* stands for the proposition that the Rehabilitation Act does not create new entitlements to services.  *See Johnson by Johnson v. Thompson*, 971 F.2d 1487 (10th Cir. 1992).  In *Johnson by Johnson*, children born with spina bifida challenged a hospital's medical treatment choices.  *Id.* at 1491.  A group of doctor-researchers wanted to test the effectiveness of an aggressive treatment for infants with spina bifida.  *Id.*  Without fully informing the parents, the doctors treated some infants with the new therapy and treated other infants with the standard care.  *Id.*  The infants receiving the experimental treatment survived at a much higher rate.  *Id.* The doctors decided which infants to treat based, in part, on the family's socioeconomic status and the prognostics of the infant's disability.  *Id.*  The plaintiffs argued that both of these metrics violated the Rehabilitation Act.  *Id.* at 1493.  The Tenth Circuit had no trouble deciding that the socioeconomic challenge was not actionable under the Rehabilitation Act because it did not relate to the infants' disabilities.  *Id.*  The Circuit further found that the plaintiffs could not use the Rehabilitation Act to challenge the doctors' determination that some of the infants were too severely ill to warrant the corrective treatment.  *Id.*  In some cases, treating the infant would have been "futile" and would have "merely prolong[ed] his or her suffering."  *Id.* at 1491.  These infants were not entitled to, or "otherwise qualified" for, the corrective treatment.  *Id.* at 1493-94. Finally, because the children did not have a substantive right to a specific treatment, the Circuit

rejected the parents' challenge that subjecting the children to the study was discriminatory. *Id.* at 1494. On these bases, the Circuit denied the plaintiffs' claims under the Rehabilitation Act.

*Baumeister*, the district court case that ENMRSH relies upon, stands for the principle that the nondiscrimination clause of the Rehabilitation Act does not create a quality of care standard. *See Baumeister v. N.M. Comm'n for the Blind*, 425 F. Supp. 2d 1250, 1265-67 (D.N.M. 2006). The district court in *Baumeister* found that a group of blind, adult plaintiffs could not use a Rehabilitation Act discrimination claim to challenge a program for blind persons in which they participated. *See id.* The *Baumeister* plaintiffs did not factually allege that they were excluded from any particular service. Nor did the plaintiffs allege that they were unable to access services because of their disabilities or differences among their disabilities. Instead, the *Baumeister* plaintiffs alleged only that the programs were unsatisfactory. Specifically, the plaintiffs alleged that the defendant sometimes placed them in "a dangerous environment" because the staff supervisors were not adequately trained. *Id.* Given this factual background, the court did not find any discrimination based on the plaintiffs' disabilities. *Id.* at 1266. The court found that the plaintiffs were challenging the level of services they received, not any discriminatory acts. *Id.* at 1266. The court found that any alleged dangerousness could be challenged under a different section of the Rehabilitation Act, but not the nondiscrimination section. *Id.*

Neither of these cases supports ENMRSH's sweeping statement that all disability service providers are *per se* immune from liability under the Rehabilitation Act and the ADA. It is true that the Rehabilitation Act does not create a right for plaintiffs to demand a service that they are not otherwise entitled to receive. *See Johnson by Johnson*, 971 F.2d at 1493-94. Nor is the Rehabilitation Act the proper legal tool to contest programs where the plaintiffs have equal access to services, but want to demand higher quality services. *See Baumeister*, 425 F. Supp. 2d

at 1266; *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 603 n.14 (1999) (explaining that the ADA does not impose a "standard of care" requirement).   Yet this does not give disability service providers a liability-free pass from the requirements of the Rehabilitation Act and the ADA.

Contrary to ENMRSH's argument, the concept of discrimination under the ADA does not necessarily require a comparison class of individuals.  *See Olmstead*, 527 U.S. at 598.   Before the Supreme Court, a disability services defendant argued the same proposition: the defendant averred that it could not discriminate against the disabled plaintiffs "because discrimination necessarily requires uneven treatment of similarly situated individuals," and the defendant did not provide similar services for the non-disabled.  *Id.*  Without a comparison class, the defendant argued, there could be no discrimination.  *Id.*  The Supreme Court rejected the argument, stating that "Congress had a more comprehensive view of the concept of discrimination advanced in the ADA."  *Id.* (explaining the unjustified isolation theory under the ADA); *see also Lane*, 541 U.S. at 537 (Ginsburg, J., concurring) (quoting same in the context of reasonable accommodations).

Disability service providers may violate the anti-discrimination mandates of the Rehabilitation Act and the ADA in several ways.  Service providers must provide "meaningful access to the benefit that the grantee offers."  *Alexander v. Choate*, 469 U.S. 287, 301 (1985).  Moreover, "to assure meaningful access, reasonable accommodations in the grantee's program or benefit may have to be made."  *Id.*  The failure to accommodate or make a reasonable modification constitutes discrimination under the Rehabilitation Act and the ADA.  *See* ADA Title III, 42 U.S.C. § 12182(b)(2)(A)(ii) (requiring places of public accommodation "to make reasonable modifications in policies, practices, or procedures"); Rehabilitation Act regulation, 28 C.F.R. § 41.53 ("A recipient shall make reasonable accommodation to the known physical or

19

mental limitations of an otherwise qualified handicapped applicant or employee . . . .").  Finally, "unjustified isolation . . . [is] discrimination based on disability."  *Olmstead*, 527 U.S. at 597.

Plaintiff may proceed against ENMRSH on one of these theories or another similar theory.  Ultimately, to prevail, Plaintiff will need to focus his claims and clearly define which benefits or accommodations he was denied.  But this is a matter best considered further down the road, after the parties have had an opportunity to conduct discovery.  For now, ENMRSH's legal theory for summary judgment is denied.

Despite this ruling, the Court must dismiss Plaintiff's ADA cause of action on other grounds.  As discussed above, ENMRSH is not an arm of the state.  Therefore, it is inappropriate to bring claims against ENMRSH under Title II of the ADA, which imposes obligations on state and local governments.  Title III, which regulates private entities, is the more appropriate chapter for Plaintiff's claims.  The Court dismisses the ADA Title II claims found in Plaintiff's Fifth Cause of Action.

### IV.    MOTION TO DISMISS DEFENDANTS SPENCER AND HOUFEK

Plaintiff brings several claims against ENMRSH's past and present chief executive officers, Defendants Robert Spencer and Damian Houfek.  Specifically, Plaintiff seeks to hold them liable for intentional torts (Count I), negligence (Count I), unfair practices (Count VI), breach of fiduciary duty (Count VII), and fraud (Count IX).  Plaintiff also sought to hold these Defendants liable for constitutional claims, but the Court dismissed these claims above.  Defendants seek to dismiss the remainder of the claims on the ground that Plaintiff failed to state a plausible claim.  (Doc. 84.)

In an Order to Show Cause, the Court asked Plaintiff to show how he planned to hold Defendant Houfek liable for Plaintiff's injuries, even though Defendant Houfek was not a

corporate officer during the time span at issue.  (Doc. 137.)  In response, Plaintiff voluntarily dismissed Defendant Houfek.  (Doc. 142.)  The Court confirmed Defendant Houfek's dismissal in a separate order quashing the Order to Show Cause.  Now, the Court evaluates whether Plaintiff stated plausible claims against Defendant Spencer.

In order to survive a Rule 12(b)(6) motion to dismiss, a plaintiff's "complaint must have enough allegations of fact, taken as true, 'to state a claim to relief that is plausible on its face.'" *Kansas Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the [pleaded] factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The complaint need not recite "detailed factual allegations, but the factual allegations must be enough to raise the right to relief above the speculative level." *Christy Sports, LLC v. Deer Valley Resort Co.*, 555 F.3d 1188, 1191 (10th Cir. 2009) (quoting *Twombly*, 550 U.S. at 556) (internal quotations omitted).

### A.  Intentional Torts

Plaintiff seeks to hold Defendant Spencer liable for the assault and battery Plaintiff suffered at the hands of ENMRSH employees, Defendant Sena and Does 1-5.  (TAC ¶ 112, 115.)  He also seeks to hold Defendant Spencer liable for Defendant Lovelady's "callous" supervision that resulted in Plaintiff's eye being chemically burned.  (*Id.* ¶ 113.)  In support of this claim, Plaintiff argues that "[o]fficers of a corporation can be held personally liable when they commit intentional torts," quoting *Kaveny v. MDA Enterprises, Inc.*, 120 P.3d 854 (N.M. Ct. App. 2005).  (Doc. 107 at 20.)  This is a correct statement of law, but Plaintiff glosses over its meaning.  Under New Mexico law, corporate officers can be held liable when *they commit* the intentional

21

tort.  In contrast, "an employer is not generally liable for an employee's intentional torts . . . ." *Ocana v. Am. Furniture Co.*, 91 P.3d 58, 70-71 (N.M. 2004).  Here, Plaintiff makes no allegations that Defendant Spencer actively aided the employee tortfeasors.  *Id.*  Nor does Plaintiff allege that Defendant Spencer personally committed any intentional torts that physically injured Plaintiff.

Plaintiff did not support his argument that officers are personally liable for the intentional torts of their employees with any suggestion that the officers helped accomplish the torts.  Under the alleged circumstances, Defendant Spencer cannot be held personally liable for the intentional torts of his employees.  The intentional tort claims against Defendant Spencer in Count I are dismissed.

### B.  Negligence

Also in Count I, Plaintiff seeks to hold Defendant Spencer liable for his employees' negligence.  "Under basic respondeat superior principles, an employer is liable for an employee's torts committed within the scope of his or her employment." *Ocana*, 91 P.3d at 70 (citing *Los Ranchitos v. Tierra Grande, Inc.*, 861 P.2d 263, 267 (N.M. Ct. App. 1993)).  Additionally, corporate officers can be held personally liable for their role in negligently training and supervising employees.  *See Los Ranchitos*, 861 P.2d at 269 ("An individual or entity may be held liable in tort for negligent hiring, negligent supervision, or negligent retention of an employee even though it is not responsible for the wrongful acts of the employee under the doctrine of respondeat superior.").  Plaintiff makes repeated averments that ENMRSH employees committed negligent or tortious acts in violation of Plaintiff's rights.  (TAC ¶¶ 55, 59, 60, 68.)  Moreover, Plaintiff alleges that Defendant Spencer can be held personally liable because of his negligent training and supervision.  (TAC ¶¶ 60, 63, 74, 115, 120, 122-123.)

"The proper standard for determining whether an employer should be held liable for negligent supervision or [training] of an employee is whether the employer knew or reasonably should have known that some harm might be caused by the acts or omissions of the employee who is entrusted with such position."  *Ocana*, 91 P.3d at 73 (quoting *Los Ranchitos*, 861 P.2d at 269).  The Third Amended Complaint clearly states that Defendant Spencer, in his role as the President and CEO of ENMRSH, "had and exercised authority over ENMRSH employees . . . ." (TAC ¶ 17.)  This creates a plausible inference that Defendant Spencer had a duty to train and supervise the "ENMRSH employees who abused, exploited, or neglected Plaintiff." (*Id.*)  The Third Amended Complaint also provides sufficient factual allegations to suggest that Defendant Spencer "knew or reasonably should have known that some harm might be caused by the acts or omissions of the employee who [wa]s entrusted" with Plaintiff's care.  *See Ocana*, 91 P.3d at 73. For example, Plaintiff charges that ENMRSH's supervisory employees, including Defendant Spencer, did not review an incident where a neighbor called police to investigate Defendant Sena's physical abuse of Plaintiff.  (TAC ¶ 56-58.)  The Third Amended Complaint also alleges that ENMRSH employees were physically abusive and negligent for years, without reprimand or training in accordance with New Mexico standards.  (TAC ¶¶ 60, 63, 74, 115, 120, 122-123.)  At the motion to dismiss stage, this is sufficient to state a plausible claim.

Additionally, Plaintiff argues that Defendant can be liable to Plaintiff for failing to meet his corporate duties.  (Doc. 107 at 12.)  Under New Mexico law, "if an officer is delegated and undertakes the corporation's duty of care and a third person relies on that undertaking and is personally injured by the breach of that duty, the officer will be personally liable" to the third party.  *Stinson v. Berry*, 943 P.2d 129, 134 (N.M. Ct. App. 1997).  To illustrate, the *Stinson* court explained that if a manager assumes a duty to inform employees about the safe operation of

machinery, but negligently fails to provide meaningful instruction, then the manager could be liable to the employees for their resulting injuries.  *See id.* (citing *Bowes v. Cincinnati Riverfront Coliseum, Inc.*, 465 N.E.2d 904, 910-12 (Ohio Ct. App. 1983)).  A plaintiff attempting to invoke this theory must show that he was injured because (1) the officer owed a duty to the corporation; (2) the plaintiff relied upon the officer properly performing that duty; and (3) the officer failed to perform the duty with reasonable care.  *Id.*  Plaintiff argues that Defendant Spencer had a duty to properly operate ENMRSH's living facilities, habilitation services, vocational training program, and representative payee program.  (TAC ¶¶ 7, 58, 63, 74, 85-103, 115, 120, 122-123.)  Further, Plaintiff argues, Defendant Spencer's operation plans were inappropriate and injured Plaintiff. (*Id.*; Doc. 107 at 13.)  Given these allegations, Plaintiff may be able to support this theory with evidence.

Defendants' motion to dismiss the negligence claims against Defendant Spencer is denied.

### C.  Unfair Practices

In Count VI, Plaintiff seeks to hold Defendant Spencer liable under the Unfair Practices Act for making false or misleading statements about ENMRSH.  (TAC ¶¶ 173-82.)  Unfair Practice claims can be made against entities or individuals.  *See Richardson Ford Sales, Inc. v. Johnson*, 676 P.2d 1344, 1345 (N.M. Ct. App. 1984) (considering an unfair practice claim against an individual); *Dellaira v. Farmers Ins. Exch.*, 102 P.3d 111, 116 (N.M. Ct. App. 2004) (considering an unfair practice claim against a corporation).

To prove an Unfair Practices Act violation, a plaintiff must prove four elements:

(1) the defendant made a false statement, (2) the defendant made the statement in connection with the "sale of services" and knew that the statement was false, (3) the defendant made the statement in the regular course of trade or commerce, and

(4) the statement was one which "may, tends to, or does deceive or mislead any person."

*Dellaira*, 102 P.3d at 116 (citing *Stevenson v. Louis Dreyfus Corp.*, 811 P.2d 1308, 1311 (N.M. 1991)).   In the Third Amended Complaint, Plaintiff alleges that Defendants ENMRSH and Spencer (1) made several, identifiable false statements, (2) when trying to sell services, (3) in the regular course of advertising their services, and (4) that these statements misled Plaintiff and his family.  (TAC ¶¶ 175-76, 178.)   This is sufficient to state a plausible claim under the Unfair Practices Act.   Thus, Defendants' motion to dismiss this claim against Defendant Spencer is denied.

### D.  Breach of Fiduciary Duty

In Count VII, Plaintiff alleges that Defendant Spencer breached his fiduciary duties to Plaintiff.  (TAC ¶¶ 184-188.)  "[A] fiduciary relationship imposes a duty on the fiduciary that is greater than the duty of good faith and fair dealing implied in all contractual relationships." *Mayeux v. Winder*, 131 P.3d 85, 93-94 (N.M. Ct. App. 2006).  As a general matter, directors of corporations have fiduciary responsibilities and duties which can be breached.  *See McMinn v. MBF Operating Acquisition Corp.*, 164 P.3d 41, 52 (N.M. 2007) (discussing director's liability for potential breach of fiduciary liability).  New Mexico courts "recognize that a fiduciary duty or confidential relationship can exist in a variety of contexts depending upon whether the relationship between the parties is one of trust and confidence."  *Moody v. Stribling*, 985 P.2d 1210, 1216 (N.M. Ct. App. 1999).  Plaintiff alleges that Defendants ENMRSH and Spencer had a fiduciary relationship with Plaintiff because they were entrusted with providing for his day-to-day living requirements, protecting his personal health and property, and collecting his wages and governmental benefits.  (TAC ¶ 184.)   This creates at least a plausible inference that

Defendants ENMRSH and Spencer had a confidential relationship with Plaintiff.  *See id.* ("[A] fiduciary relationship exists in all cases where there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of one reposing the confidence." (quoting *Allsup's Convenience Stores, Inc. v. N. River Ins, Co.*, 976 P.2d 1, 15 (N.M. 1999))); *Johnstone v. City of Albuquerque*, 145 P.3d 76, 82 (N.M. Ct. App. 2006) (discussing that trained mental health professionals may have a "special relationship" with a patient for the purposes of finding a fiduciary duty).

"A fiduciary duty is a duty of loyalty."  *Moody*, 985 P.2d at 1218 (citing *In re Estate of McKim*, 807 P.2d 215, 220 (N.M. 1991).  "A fiduciary is obliged 'to act primarily for another's benefit in matters connected with such undertaking . . . [and] breaches this duty by placing his interests above those of the beneficiary."  *Kueffer v. Kueffer*, 791 P.2d 461, 464 (N.M 1990) (citing Black's Law Dictionary 563 (5th ed. 1979)).  The plaintiff must also allege that he suffered harm from the breach.  *See Moody*, 985 P.2d at 1218 (citing *Turpin v. Smedinghoff*, 874 P.2d 1262, 1265 (N.M. 1994)).

Plaintiff makes several factual averments to support the inference that Defendant Spencer breached his duty of loyalty.  First, Plaintiff avers that Defendant Spencer took an unduly large salary, $450,000 annually, in his role as a nonprofit President.  (TAC ¶ 101.)  Second, he alleges that Defendant Spencer misused Plaintiff's Medicaid and Social Security payments to benefit himself and increase his salary instead of providing necessary services to Plaintiff.  (TAC ¶¶ 15, 84-85, 100, 186.)  Third, Plaintiff claims that Defendants ENMRSH and Spencer used Plaintiff's labor without adequately compensating him.  (TAC ¶¶ 7, 54.)  Finally, the Third Amended Complaint alleges that Defendant Spencer had an improper relationship with the Spencer Foundation.  (TAC ¶¶ 13, 16, 102, 103.)  Specially, Plaintiff alleges that Defendant Spencer took

millions of dollars that should have to gone to ENMRSH clients and redirected the money to support the Spencer Foundation.  (*Id.*)  With these allegations, Plaintiff has stated a plausible breach of fiduciary duty claim against Defendant Spencer.

### E.  Fraud

In Count IX, Plaintiff alleges that Defendant Spencer committed fraud when he represented to the government and the public that ENMRSH was a high quality institution. (TAC ¶¶ 198-204.)  To make a fraud claim, Plaintiff must allege that (1) Defendant made a misrepresentation of fact, (2) Defendant knew that the representation was false or recklessly disregarded the truth, (3) Defendant intended to deceive Plaintiff and induce his reliance on the misrepresentation, and (4) Plaintiff detrimentally relied on the misrepresentation.  *See Williams v. Stewart*, 112 P.3d 281, 290 (N.M. Ct. App. 2005) (stating elements for fraud); N.M. Rules Ann. Civ. Unif. Jury Instr. § 13-1633.  "[A] plaintiff alleging fraud may recover 'such damages as are the direct and natural consequences' of the reliance on a fraudulent representation." *Williams*, 112 P.3d at 290 (quoting *Indus. Supply Co. v. Goen*, 276 P.2d 509, 512 (N.M. 1954)).

In the Third Amended Complaint, Plaintiff alleges that Defendant Spencer knowingly made several misrepresentations that induced Plaintiff and his family to rely on ENMRSH's services.  (TAC ¶¶ 198-203.)  Thus, Plaintiff stated a claim of fraud against Defendant Spencer.

### F.  Piercing the Corporate Veil

Where a "corporation was set up for fraudulent purposes," New Mexico courts will pierce the corporate veil.  *Scott v. AZL Res., Inc.*, 753 P.2d 897, 900 (N.M. 1988) (citing *Scott Graphics, Inc. v. Mahaney*, 549 P.2d 623, 626 (N.M. Ct. App. 1976)).  When a court pierces the corporate veil, the shareholders are liable for the corporation's wrongs.  *See id.*  Before piercing the corporate veil, a plaintiff must put the defendant "on notice" of its intention.  *Garcia v.*

*Coffman*, 946 P.2d 216, 219 (N.M. Ct. App. 1997).   A complaint can give a defendant "a fair idea of the nature of the claim" even if it does not explicitly state that the Plaintiff seeks to pierce the corporate veil.   *See id.*   In *Garcia*, the New Mexico Court of Appeals found that the plaintiff pled sufficient facts to alert the defendant of his intention to pierce the corporate veil where he alleged that the defendant enriched himself at the plaintiff's expense.   *Id.*   Plaintiff has made similar allegations here, sufficient to put Defendant Spencer on notice that Plaintiff seeks to pierce the corporate veil.   (TAC ¶¶ 13, 100-03.)   Whether Plaintiff may obtain this relief is another question.

## V.   MOTION TO DISMISS WORKPLACE INJURY CLAIM

In their second motion to dismiss, Defendants challenge Plaintiff's allegations regarding the caustic chemical burn because, Defendants argue, New Mexico's Workers' Compensation Act is the exclusive remedy for that injury.   (Doc. 90.)   In his Complaint, Plaintiff avers that he was entitled to and actually received Workers' Compensation Act benefits based on the caustic chemical incident.   (TAC ¶50-53.)   Regardless, Plaintiff argues that the exclusivity of Workers' Compensation should not apply because (1) Plaintiff was not an ENMRSH employee; (2) Plaintiff lacked capacity to enter into employment contracts; (3) during the incident, ENMRSH was acting as Plaintiff's Developmentally Disabled Waiver Service Provider, not as an employer; (4) the claim is based on an intentional tort; and (5) state law cannot bar Plaintiff's federal claims because of the Supremacy Clause.   (Doc. 104 at 3.)

First, in his brief, Plaintiff points to arguments and evidence that suggest a factual dispute over Plaintiff's status as an employee.   (Doc. 104 at 19.)   At the motion to dismiss stage, however, the Court must look to the complaint, not to proposed evidence outside of the pleadings.   *See Tal v. Hogan*, 453 F.3d 1244, 1252 (10th Cir. 2006) ("The court's function on a

28

Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted." (quoting *Sutton v. Utah State Sch. for the Deaf & Blind*, 173 F.3d 1226, 1236 (10th Cir. 1999))). In the Third Amended Complaint, Plaintiff avers that he was "an employee of ENMRSH" who "was entitled to workers' compensation." (Doc. 81 ¶ 51.) Plaintiff's attempt to create a factual dispute over Plaintiff's status as an employee is unavailing. At the motion to dismiss stage, Plaintiff cannot rely on theoretical evidence in his Response to overcome the allegations in his Complaint. Based on the clear allegations in the Third Amended Complaint, Plaintiff was an employee for the purposes of this motion to dismiss.

Second, the Court disagrees with the argument that finding Plaintiff an employee for these purposes would be against public policy. Despite Plaintiff's arguments, just because a person has a disability, does not mean that the employment relationship is void under the law. Under both the law and public policy, individuals with disabilities are permitted, and encouraged, to enter into employment relationships. *See* N.M. Dept. of Health, Developmental Disabilities Waiver Service Standards, IV.D-V (2007) (encouraging job placement and career development plans); Fair Labor Standards Act regulation, 29 C.F.R. § 525.3(g) ("An employment relationship arises whenever an individual, including an individual with a disability, is suffered or permitted to work."). This policy argument does not overcome the clear factual allegations in the Third Amended Complaint.

Third, in his Response brief, Plaintiff claims that during the incident, ENMRSH was acting as Plaintiff's Developmentally Disabled Waiver Service Provider, not as his employer. (Doc. 104 at 20.) Again, this assertion directly contradicts Plaintiff's averments in his Third Amended Complaint, where he repeatedly states that ENMRSH was acting as his employer.

(TAC ¶¶ 29, 30, 32, 38, 39, 42, 44, 50-54.)  Plaintiff expressly asserts that his eye was harmed during "a work-related injury."  (TAC ¶ 50.)  Based on the Third Amended Complaint, Plaintiff's claim regarding the caustic chemical eye injury is directly related to ENMRSH's role as an employer.  In his briefing, Plaintiff argues that his injury "occurred as a direct result of this conflict of interest between [ENMRSH's] two personas" as both an employer and a Developmental Disabilities Waiver Service Provider.  (Doc. 104 at 21.)  Plaintiff does not make these allegations in his Third Amended Complaint.

Fourth, Plaintiff argues that Workers' Compensation is not the exclusive remedy for his eye injury because Defendant Lovelady committed an intentional tort.  (Doc. 104 at 21.)  In making this argument, Plaintiff relies on the doctrine from *Delgado v. Phelps Dodge Chino, Inc.*, 34 P.3d 1148 (N.M. 2001).  In *Delgado*, the New Mexico Supreme Court ruled that Workers' Compensation was not a widow's exclusive remedy.  *Id.* at 1151.  In that case, the employer sent the deceased worker into a patently dangerous work environment even through the employer "knew or should have known that Delgado would die or suffer great bodily harm."  *Id.*  To make a *Delgado* claim, a plaintiff must show:

> (1) the worker or employer engages in an intentional act or omission, without just cause or excuse, that is reasonably expected to result in the injury suffered by the worker; (2) the worker or employer expects the intentional act or omission to result in the injury, or has utterly disregarded the consequences; and (3) the intentional act or omission proximately causes the injury.

*Id.* at 1156.  In addition to these three elements, "plaintiffs must plead or present evidence that the employer met each of the three *Delgado* elements through actions that exemplify a comparable degree of egregiousness as the employer in *Delgado* in order to survive a pre-trial dispositive motion."  *Morales v. Reynolds*, 97 P.3d 612, 617 (N.M. Ct. App. 2004).  "Negligence on the part of the employer does not expose the employer to tort liability, just as negligence on

the part of the worker does not preclude relief under the Act." *Id.* at 616.  Plaintiff's Third

Amended Complaint does not make the necessary showing.  At various times, Plaintiff alleges

that ENMRSH failed to properly train its employees and failed to implement safety precautions.

However, there is "no evidence that the employer expected any of its actions to result in the

worker's injury or that the employer utterly disregarded the consequences of these actions." *Id.*

(quoting *Cordova v. Peavey Co.*, 273 F. Supp. 2d 1213, 1219 (D.N.M. 2003)).  Without such

allegations, Plaintiff cannot invoke the *Delgado* exception to the exclusivity of the Workers'

Compensation Act.

Finally, Plaintiff argues that his federal claims should not be barred by the exclusivity

provision of the Workers' Compensation Act.  (Doc. 104 at 23-24.)  In making this argument,

Plaintiff assumes that Defendants sought to bar his entire Third Amended Complaint.  On the

contrary, Defendants do not seek to bar any of Plaintiff's federal claims.  (Doc. 122 at 13-14.)

Defendants only seek to strike any allegations related to the caustic chemicals and Plaintiff's eye

injury.

The Workers' Compensation Act provides an exclusive remedy where:

A. at the time of the accident, the employer has complied with the provisions
   thereof regarding insurance;

B. at the time of the accident, the employee is performing service arising out of
   and in the course of his employment; and

C. the injury or death is proximately caused by accident arising out of and in the
   course of his employment and is not intentionally self-inflicted.

N.M. Stat. Ann. § 52-1-9.  Based on the allegations in the Third Amended Complaint, the second

and third requirements are met.  Plaintiff alleges that he was working for ENMRSH when he was

injured by the caustic chemicals and that his injury was "work-related."  (TAC ¶ 50-51.)  The

Court can also reasonably infer the first requirement—that the employer was adequately insured—because Plaintiff in fact received workers' compensation for his injury.  (TAC ¶¶ 51, 53.)  Because all three requirements are met, Workers' Compensation is Plaintiff's exclusive remedy for his eye injury.  "The payment of compensation by the employer in accordance with the order of the [Workers' Compensation] director discharges the employer from all further obligation as to that compensation."  N.M. Stat. Ann. § 52-5-11(E) (describing procedures for paying incompetent persons).  Plaintiff may not doubly recover for this injury.  The Court thus grants Defendants' motion to dismiss; the allegations related to Plaintiff's eye injury contained in Count I are dismissed.  Additionally, because the only claims against her are related to the eye injury, the Court dismisses Defendant Tisha Lovelady from the suit.

## VI.   DEFENDANT ROBERT B. SPENCER FOUNDATION'S MOTION TO DISMISS

Defendant Robert B. Spencer Foundation ("Spencer Foundation") moves to dismiss the claims against it.  (Doc. 95.)  Although the Complaint names the Spencer Foundation as a Defendant and describes it as a party, Plaintiff does not expressly allege that Defendant Spencer Foundation is liable under any particular cause of action.  In comparison, Plaintiff asserts causes of action against each of the remaining thirteen Defendants.  In Response to the motion to dismiss, Plaintiff claims that the Spencer Foundation is liable because it was part of joint venture with Defendants Spencer and ENMRSH or because it is the alter ego of Defendants Spencer and ENMRSH.  (Doc. 110 at 10-11.)

### A.  Joint Venture

In New Mexico, a party may be liable for the negligence of its joint venturers.  *See Schall v. Mondragon*, 393 P.2d 457, 460 (N.M. 1964) ("If two or more persons unite in a joint

prosecution of a common purpose, under such circumstances that each has the authority to control the means employed to execute such purpose, the negligence of one is chargeable to the other . . . .").  The Third Amended Complaint concludes that the Spencer Foundation, ENMRSH, Defendant Spencer, and Defendant Houfek entered in a partnership or joint venture.  (TAC ¶ 14.)  To factually support this conclusion, the Third Amended Complaint alleges that ENMRSH and the Spencer Foundation have a number of officers and board members in common (*Id.*); that the Spencer Foundation's Articles of Incorporation state that it was "organized exclusively for charitable and educational purposes including, for such purposes, the making of distributions to ENMRSH, Inc." (*Id.* ¶ 13); that ENMRSH distributed $10.3 million to the Spencer Foundation from 2007-2011 (*Id.*); and that the Spencer Foundation distributed "just $47,000 to ENMRSH" in the same time period (*Id.*).  The Complaint asserts that ENMRSH "funneled funds and resources" to the Spencer Foundation.  (*Id.* ¶ 16.)

The Third Amended Complaint alleges suspicious activity, but does not sufficiently plead facts to support the conclusion that ENMRSH and the Spencer Foundation formed a joint venture.  In order to form a joint venture under New Mexico law, "there must be a community of interest in the performance of a common purpose, a joint proprietary interest in the subject matter, a mutual right to control, a right to share in the profits, and a duty to share in any losses which may be sustained."  *Cooper v. Curry*, 589 P.2d 201, 205 (N.M. Ct. App. 1978); *see also* N.M.R. Ann.  Unif. Jury Instructions § 13-410 (stating jury instructions for formation of a joint venture).

Based on the Third Amended Complaint's allegations, a factfinder could reasonably find a community of interest between ENMRSH and the Spencer Foundation.  However, in *Cooper*, the New Mexico Court of Appeals ruled that a community of interest alone is "insufficient to

create a joint venture." 589 P.2d at 205.  Importantly, Plaintiff does not produce facts to support any of the other requirements.  He does not allege that the Spencer Foundation had a proprietary interest in ENMRSH's property, that they had a mutual right to control, or a right to share in each other's profits.  Plaintiff avers that the two entities profited from each other, but not that they had a right to share in profits.  That is an important legal difference.  *See Rogers v. Anheuser-Busch, Inc.*, 491 F.3d 1165, 1172 (10th Cir. 2007) (finding that sponsorship rights do not create a joint venture, even where both entities can mutually profit from the success of an endeavor).  A joint venture is not the proper legal theory to describe the relationship between the Spencer Foundation and ENMRSH.

## B.  Alter Ego

In his Response to the motion to dismiss, Plaintiff presents a second theory for holding the Spencer Foundation liable: an alter ego theory.  (Doc. 110 at 10-11.)  Specifically, Plaintiff argues that the Spencer Foundation is an alter ego either of ENMRSH or Defendant Spencer. Plaintiff did not expressly allege this theory in the Third Amended Complaint.  He did allege that Defendants ENMRSH, Spencer "benefited themselves by operating . . . through holding companies and/or non-profit corporations including the Foundation."  (TAC ¶ 103.)  Under New Mexico law, the plaintiff's complaint must give the defendant sufficient "notice of a claim of alter ego."  *See Dellaira*, 102 P.3d at 116; *see also Garcia*, 946 P.2d at 219 (holding that the complaint was adequate to inform defendant that plaintiff sought to hold defendant personally liable for acts of corporation); *Carreon v. Goodtimes Wood Products, Inc.*, No. CIV 09-161 BB/CEG, 2011 WL 9686895, at *6 (D.N.M. Mar. 22, 2011) (discussing pleading requirement for an alter ego theory).

The Court finds that the Third Amended Complaint does not sufficiently state an alter ego claim.  Before piercing the corporate veil, a plaintiff must make three required showings: "a showing of instrumentality or domination, improper purpose and proximate causation."  *Scott*, 753 P.2d at 900.  Plaintiff avers, briefly, in the Third Amended Complaint that Defendants ENMRSH and Spencer dominated the Spencer Foundation and used the company to improperly deposit assets.  (TAC ¶ 103.)  Thus, Plaintiff alleges that Defendants ENMRSH and Spencer engaged in bad acts that injured Plaintiff.  The Spencer Foundation, in comparison, was merely a depository.  Plaintiff never alleges that the Spencer Foundation itself ever caused Plaintiff injury—proximately or otherwise.

Plaintiff does not bring a traditional alter ego theory.  Usually, plaintiffs wish to pierce the corporate veil when an underfunded corporation has a liability and cannot meet its financial obligations.  *See Carreon*, 2011 WL 9686895, at *7 ("This moral culpability exists, for example, when a corporation is left underfunded, to the detriment of creditors and the benefit of the dominating party.").  In such situations, a plaintiff may pierce the corporate veil to access the assets of the dominating party—usually a shareholder or a parent corporation—who did not directly injure the plaintiff, but who misused the underfunded corporation to shield itself from liability.  *See Scott*, 753 P.2d at 900 (discussing parent-subsidiary corporate veils); *Scott Graphics, Inc. v. Mahaney*, 89 N.M. 208 (N.M. Ct. App. 1976) (discussing shareholders' corporate veils).

Here, Plaintiff turns the logic upside down.  Plaintiff's Third Amended Complaint lodges direct complaints against the two alleged dominating parties, Defendants ENMRSH and Spencer; and not against the alleged alter ego.  His theory that Defendants ENMRSH and Spencer improperly funneled funds to the Spencer Foundation are akin to saying that Defendants

ENMRSH and Spencer improperly funneled funds to an off-shore bank account or similar property. In such situations, the bank account is not liable for any injury the plaintiff suffered. Of course, if a plaintiff wins a judgment against a bad actor, he can seek to collect the judgment from the defendant's bank accounts, properties, or other holdings. That, however, is insufficient to name the bank account as a defendant in the original action.

In sum, the alter ego theory is not an appropriate legal theory for holding the Spencer Foundation liable for Plaintiff's injuries. Because Plaintiff did not make any direct allegations against Defendant Spencer Foundation and has not presented any plausible theories for holding the Spencer Foundation liable, Defendant Spencer Foundation is dismissed from this suit. Defendant Spencer Foundation's motion is granted.

## VII.   CONCLUSION

Plaintiff has alleged several serious allegations occurring over a number of years. The Court grants in part and denies in part Defendants' Motion to Dismiss Defendants Houfek and Spencer. (Doc. 84.) Earlier, in a separate order, the Court dismissed Defendant Houfek. The Court, agreeing with Defendants' arguments, dismisses the intentional tort claims against Defendant Spencer. However, the Court found that Plaintiff stated a plausible claim against Defendant Spencer for negligence, unfair practices, breach of fiduciary duty, and fraud.

The Court grants Defendants' Motion to Dismiss Plaintiff's Workplace Injury Claim. (Doc. 90.) Based on the factual averments in the Complaint, the Court finds that this particular injury—Plaintiff's chemical eye burn—was covered exclusively by New Mexico's Workers' Compensation Act. Additionally, because this claim is dismissed, the Court also dismisses Defendant Tisha Lovelady as a defendant.

The Court also grants Defendant Robert B. Spencer Foundation's Motion to Dismiss. (Doc. 95.)  Plaintiff improperly attempted to use corporate veil-piercing theories to hold the Spencer Foundation liable for Plaintiff's injuries.  However, Plaintiff never alleges that the Spencer Foundation, itself, committed a wrong against Plaintiff.  The Court dismisses Defendant Spencer Foundation from this suit.

The Court denies Defendants' Motion for Summary Judgment Regarding Plaintiff's ADA and Rehabilitation Act Claims. (Doc. 103.)  ENMRSH does not get a liability-free pass under these Acts simply because it is a disability service provider.  However, the Court dismisses Plaintiff's Fifth Cause of Action, stating ADA Title II claims, because the Court finds that ENMRSH cannot be held liable under Title II of the ADA.

Finally, the Court grants Defendants' Motion for Summary Judgment Regarding Plaintiff's Constitutional Claims.  (Doc. 130.)  The constitutional violations that Plaintiff alleges all require a state actor.  Plaintiff failed to show that ENMRSH or its employees were state actors.  Therefore, the constitutional claims are all dismissed.

**THEREFORE,**

**IT IS ORDERED** that

(1) Defendants' Motion to Dismiss Defendants Houfek and Spencer (Doc. 84) is **GRANTED** in part and **DENIED** in part;

(2) Defendants' Motion to Dismiss Plaintiff's Workplace Injury Claim (Doc. 90) is **GRANTED**, and Defendant Tisha Lovelady is **DISMISSED** from the suit;

(3) Defendant Robert B. Spencer Foundation's Motion to Dismiss (Doc. 95) is **GRANTED**, and Defendant Robert B. Spencer Foundation is **DISMISSED** from the suit;

(4) Defendants' Motion for Summary Judgment Regarding Plaintiff's ADA and Rehabilitation Act Claims (Doc. 103) is **DENIED**;

(5) Defendants' Motion for Summary Judgment Regarding Plaintiff's Constitutional Claims (Doc. 130) is **GRANTED**, and the claims found in the Second Cause of Action are dismissed; and

(6) The Court, *sua sponte*, dismisses Plaintiff's ADA Title II claims found in the Fifth Cause of Action.

**ROBERT C. BRACK**
UNITED STATES DISTRICT JUDGE